1ST BANK SOUTHEAST OF KENOSHA, WISCONSIN, as Personal Representative of the Estate of Stanislaus Wojtyn, Plaintiff,

v.

M/V KALIDAS and Shipping Corporation of India, Ltd., Defendant and Third-Party Plaintiffs,

v.

KAT REALTY CORP., et al., Third-Party Defendants and Fourth-Party Plaintiffs,

v.

WESTLAKE HARBOR TERMINALS, INC., et al., Fourth-Party Defendants.

No. 82–C–1503.

United States District Court, E.D. Wisconsin.

Oct. 6, 1987.

Kenneth R. Baumgartner, Baumgartner & Moddes, S.C., Kenosha, Wis., Karl L. Cambronne, Chestnut & Brooks, P.A., Minneapolis, Minn., for plaintiff.

Robert Elliot, Cook & Franke, S.C., Milwaukee, Wis., for M/V Kalidas and Shipping Corp.

Nonald Lewis, Kasdorf, Dall, Lewis & Swietlik, S.C., Milwaukee, Wis., for KAT and Northbrook.

Christine Ohm, Kluwin, Dunphy & Hankin, Milwaukee, Wis., for Iowa Nat. Mut.

James E. Culhane, Davis & Kuelthau, Milwaukee, Wis., for Phillip Allen Froud, Orion, Indem. Marine, Threadneedle, Commercial Union.

Michael Hogan, Riordan, Crivello, Carlson, Mentkowski & Henderson, Milwaukee, Wis., for Travelers Ins.

## MEMORANDUM OF DECISION

CURRAN, District Judge.

First Bank Southeast of Kenosha, Wisconsin, as personal representative of the estate of Stanislaus Wojtyn [1] commenced this wrongful death action against the M/V Kalidas and the Shipping Corporation of India, Ltd. (the "ship defendants") [2] alleging that Wojtyn's drowning death "was exclusively caused by the careless and negligent conduct of the ship's crew in failing to keep said vessel's lines from snapping." *See* Complaint at ¶ 11. Wojtyn, a longshoreman, was assisting in the berthing of the M/V Kalidas at the dock in the Kenosha, Wisconsin harbor at the time of his death on November 1, 1982. The defendants, in turn, filed a third-party complaint for contribution against KAT Realty Corporation, the owner of the dock, and its insurer, Northbrook Property and Casualty Insurance Company (the "dock defendants"). [3] The third-party defendants then filed a fourth-party complaint for indemnification or contribution against Westlake Harbor Terminals, the employer of Wojtyn, and its insurers, Phillip Allen Froud, Orion Insurance Company, Ltd., Indemnity Marine Company, Ltd., Threadneedle Insurance Company, Commercial Union Assurance Company, Ltd., [4] Iowa National Mutual Insurance Company and Travelers Insurance Company. Finally, the plaintiff amended the complaint by adding a claim against KAT Realty Corporation and Northbrook Property and Casualty Insurance Company alleging that:

Upon information and belief, that said KAT Realty Corp. through its agents, servants and employees carelessly and negligently failed to properly maintain and repair said dock thereby causing the moving lines from said defendant motor vessel to become hung up on the ragged face of the dock. That as a result of said negligence combined with the negligence of the defendant motor vessel and its owner as aforesaid, one of the moving lines from said vessel snapped in a sudden manner striking Stanislaus Wojtyn causing his death as aforesaid.

Amended Complaint at ¶ 4. Due to the death of Wojtyn, the plaintiff is seeking over one million dollars in pecuniary damages, plus $25,000.00 for loss of society and companionship on behalf of Wojtyn's son,

---

1. By stipulation of the parties 1st Bank Southeast of Kenosha, Wisconsin was substituted for the original plaintiffs, Joel Strang, the minor son of Stanislaus Wojtyn, by his Guardian ad Litem, Terry L. Constant, and Anastasia Wojtyn, mother of the deceased. *See* Stipulation and Order of November 13, 1984.

2. The original plaintiffs named a fictitious insurance company, XYZ Insurance Company, as a party defendant, but this party was dismissed by stipulation. *See* Stipulation and Order of December 17, 1982.

3. KAT Realty Corporation and Northbrook Property and Casualty Insurance Company were substituted for the original fourth-party defendants, Kenosha Auto Transport Corporation and Transport Indemnity Company. *See* Stipulation and Order of August 10, 1983.

4. Phillip Allen Froud, Orion Insurance Company, Ltd., Indemnity Marine Company, Ltd., Threadneedle Insurance Company, and Commercial Union Assurance Company, Ltd. were substituted for original fourth-party defendant, Underwriters at Lloyds.

Joel Strang,[5] and $500,000.00 in pecuniary damages, plus $5,000.00 for funeral expenses and $25,000.00 for loss of society and companionship on behalf of Wojtyn's mother, Anastasia Wojtyn.[6]

This matter was tried to the court for five days with the following witnesses testifying:

| | |
|---|---|
| James Delaney: | longshoreman employed by fourth-party defendant Westlake Harbor Terminal; foreman of the linesmen involved in this incident; |
| Ross Bauers: | longshoreman and linesman; |
| Dominick Salerno: | time keeper employed by fourth-party defendant Westlake Harbor Terminal; |
| John Samson: | pathologist and director of laboratories at St. Catherine Hospital in Kenosha, Wisconsin; |
| Charles Schoepke: | police officer for the City of Kenosha; |
| Phillip Hegforce: | longshoreman and linesman; |
| Glenn Miller: | longshoreman and linesman; |
| Anastasia Wojtyn: | mother of the deceased Stanislaus Wojtyn; |
| James Geffert: | economist, expert witness; |
| Suzzane Bruenning: | mother of Joel Strang, the natural child of the deceased Stanislaus Wojtyn. |

In addition to the live testimony, the plaintiff offered the deposition of Earl L. Shaw, Jr., a marine surveyor who was retained and deposed as an expert witness for the M/V Kalidas and Shipping Corporation of India, Ltd. The defendants, in turn, offered the deposition testimony of Sarveen Narula, the additional chief mate of the M/V Kalidas at the time of the incident. Fourth-party defendants Westlake Harbor Terminals and Iowa National Mutual Insurance Company offered the depositions of Elmer Erbentraut, Jr., a part-time guard for Schmitt Security Company at the time of the incident, and J. Hal Brown, a marine engineer who had been retained as an expert witness by the plaintiff. After reviewing these depositions and the posttrial briefing, the court denied the defendants' motion for involuntary dismissal which was made at the close of the plaintiff's evidence. *See* Decision and Order of July 13, 1987. The court also granted the parties leave to file posttrial briefs addressing the case as a whole. This briefing having now been completed, the court sets forth its Findings of Fact separately from its Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## I. UNCONTESTED FACTS

Prior to trial the parties stipulated to the following facts which the court adopts and incorporates into this decision:

Stanislaus Wojtyn, an unmarried man who was born on February 20, 1946, died on November 1, 1982, in an accident which occurred at the Kenosha Harbor. He was acting as a longshoreman when he was killed. In particular, he was assisting other longshoremen in berthing the M/V KALIDAS at the time of the accident. Anastasia Wojtyn is his mother, with whom he lived at the time of his death. Joel Strang was his natural son who, on the date of his father's death, was two years old.

The M/V KALIDAS is a vessel owned by the Shipping Corporation of India. The vessel entered Kenosha Harbor on November 1, 1982, to load cargo. KAT Realty Corporation is the owner of the dock where the accident took place and is the lessor of said dock. Northbrook Property and Casualty Insurance Company is the insurance carrier for KAT Realty Corporation. Westlake Harbor Terminals, Inc. is the lessee of the premises at which the accident occurred and was the employer of the decedent, Stanislaus Wojtyn. Westlake Harbor Terminals, Inc. is a stevedore employer of long-

---

**5.** The Kenosha County Circuit Court adjudged Stanislaus Wojtyn to be the father of Joel W. Strang. *See* Defendants' Trial Exhibit 219.

**6.** A parent of a deceased cannot recover nonpecuniary damages for loss of society in a wrongful death action brought under general maritime law when the parent is not dependent upon the deceased and when the deceased is survived by a child. *See Sistrunk v. Circle Bar Drilling Company*, 770 F.2d 455 (5th Cir.1985), *cert. de-*

*nied*, 475 U.S. 1019, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986). The evidence at trial established that Anastasia Wojtyn was not financially dependent upon her son Stanislaus before his death. Therefore, she could not be awarded damages for loss of society and companionship.

shoremen. It is insured by the Iowa National Insurance Company.

Phillip Allen Froud, Orion Insurance Company, Ltd., Indemnity Marine Company, Ltd., Threadneedle Insurance Company, and Commercial Union Assurance Company, Ltd. are insurers of Westlake Harbor Terminals, Inc.

The Travelers Insurance Company is the workers' compensation carrier for the stevedore, Westlake Harbor Terminals, Inc., and provides insurance coverage to the company pursuant to the terms of the Longshoremen and Harbor Workers' Compensation Act.

First Bank Southeast of Kenosha, Wisconsin is the personal representative of the Estate of Stanislaus Wojtyn and is bringing this action on behalf of heirs of the decedent. Anastasia Wojtyn and Joel Strang are the only heirs of the decedent.

Pretrial Report of the Parties at 1–3.

## II. FINDINGS OF FACT

In addition to the foregoing uncontroverted facts, the following facts have been established by a preponderance of the evidence.

1. On October 31, 1982, longshoreman and linesman Stanislaus Wojtyn reported for work on the dock at the Kenosha, Wisconsin harbor at approximately 6:00 P.M. *See* Transcript at 12, 294.

2. Wojtyn and three other longshoremen—Ross Bauers, Phillip Hegforce and Glenn Miller—and their foreman, James Delaney, were assigned to act as linesmen for the berthing of the M/V Kalidas, which was expected at the Kenosha dock that night. *See* Transcript at 11, 117, 283, 335.

3. The M/V Kalidas is an ocean-going motor vessel which was being operated on navigable waters during all times relevant to this action. The owner of the ship, defendant Shipping Corporation of India, Ltd., is a commercial entity wholly-owned by the government of the State of India. *See* Affidavit of V. Castro at ¶ 2 (filed November 21, 1984).

4. At approximately 4:00 A.M. on November 1, 1982, the M/V Kalidas entered the Kenosha Harbor for berthing. *See* Transcript at 13; Deposition of Sarveen Narula at 11; Plaintiff's Trial Exhibit 5.

5. During the berthing operation the additional chief mate of the M/V Kalidas, Sarveen Narula, was stationed on the bow observation platform on the ship. He communicated with foreman Delaney on the dock by walkie talkie. *See* Deposition of Sarveen Narula at 12, 13, 36.

6. During the berthing operation, Shri Biswas, petty officer in charge of maintenance for the M/V Kalidas, was operating the controls for the anchors and the warping drums. *See* Deposition of Sarveen Narula at 19, 85.

7. During the berthing operation it was dark, raining, thundering, lightening, foggy and windy. *See* Transcript at 13, 41, 148; Deposition of Elmer Erbentraut, Jr. at 15; Deposition of Sarveen Narula at 23.

8. There was no lighting on the dock in the immediate vicinity of the berthing operation. *See* Transcript at 46.

9. The face of the dock in the vicinity of the berthing operation was "ragged" with timbers, bolts and brackets protruding. *See* Transcript at 40, 47, 314, 353; Deposition of Earl L. Shaw, Jr. at 13.

10. The M/V Kalidas entered the Kenosha Harbor with its bow facing west and its port side toward the dock. When the bow was at or near the dock, the ship underwent a turning maneuver. During the turning maneuver, the ship is turned so that its starboard side is toward the dock and the ship is facing east. *See* Transcript at 16, 94, 95, 104.

11. The ship remained under power during the turning maneuver. As the mooring lines were paid out during the berthing operation, the bow was perpendicular to the dock and was almost motionless, but was drifting slightly to the north. *See* Transcript at 94, 136; Deposition of Elmer W. Erbentraut, Jr. at 69.

12. During the berthing operation, James Delaney, the foreman of the linesmen, was in contact with the crew of the ship by walkie talkie. *See* Transcript at 58.

13. When the M/V Kalidas entered the turning basin and its bow was at or near the dock, a line (the first line) was thrown out near a bollard on the dock. *See* Transcript at 16; Deposition of Sarveen Narula at 64.

14. The mooring lines of the M/V Kalidas are 64 millimeters in diameter and 90 fathoms in length and are made of eight-strand nylon polypropylene. *See* Deposition of Sarveen Narula at 213; Deposition of Earl L. Shaw, Jr. at 36.

15. A line is paid out by the crew by hand from a coil on deck. After a line is attached to a bollard, the end of the line on deck is wrapped around a warping drum and tightened. *See* Deposition of Sarveen Narula at 61, 62, 85, 151.

16. The first line was attached to a bollard by one or more of the longshoremen on the dock. *See* Transcript at 17.

17. After the first line was attached to the bollard, the first line was tightened by the crew on board the ship and it appeared to be taut during the remainder of the time at issue. *See* Transcript at 53, 59, 126, 158, 292; Deposition of Sarveen Narula at 75, 75.

18. After the first line had been tightened, a second line was thrown out by the ship's crew. *See* Transcript at 21, 122; Deposition of Elmer W. Erbentraut, Jr. at 44.

19. After the second line was thrown out, Delaney asked the crew for more slack. *See* Transcript at 86; Deposition of Elmer W. Erbentraut, Jr. at 44, 46; Deposition of Sarveen Narula at 212.

20. The second line was attached or in the process of being attached to a bollard by one or more of the linesmen. *See* Transcript at 22; Deposition of Elmer W. Erbentraut, Jr. at 47–51.

21. Delaney received an order from the ship to move the second line to the next bollard to the east. *See* Transcript at 58, 64, 123; Deposition of Elmer W. Erbentraut, Jr. at 54.

22. The second line was moved from the first bollard. Ross Bauers was holding the eye of the line. He was followed in line by Phillip Hegforce, Glenn Miller and Stanislaus Wojtyn, as the linesmen began to carry the second line to the next bollard which was approximately ten meters to the east. *See* Transcript at 27, 121–22, 288; Deposition of Elmer W. Erbentraut, Jr. at 59.

23. Before the second line was attached to the second bollard, linesmen Bauers and Hegforce heard a loud noise. *See* Transcript at 123, 124, 291. Security guard Erbentraut also heard the noise. *See* Deposition of Elmer W. Erbentraut, Jr. at 61, 70.

24. Hegforce and Erbentraut saw Wojtyn somersault into the water. *See* Transcript at 291; Deposition of Elmer W. Erbentraut, Jr. at 61, 62.

25. Wojtyn's body was seen in the water for a brief time, then it disappeared until the lifeless body was located in the water at approximately 10:00 A.M. on November 1, 1982. *See* Transcript at 125; Plaintiff's Trial Exhibit 41.

26. Stanislaus Wojtyn's death was caused by drowning. *See* Transcript at 199; Plaintiff's Trial Exhibit 40.

27. John G. Samson, M.D., performed an autopsy on Wojtyn's body and determined that he had been hit by two objects simultaneously. The injuries, which in Samson's opinion were consistent with injuries caused by rope, included a fracture of the right femur, a fracture of the right humerous, broken ribs, a lascerated penis, an envisceration right testicle and numerous bruises. *See* Transcript at 200; Plaintiff's Trial Exhibit 40.

28. Based on the above facts, the court finds that Stanislaus Wojtyn was struck and knocked into the water by a mooring line leading from the M/V Kalidas.

29. The plaintiff has failed to prove by a preponderance of the evidence that the M/V Kalidas was negligent with respect to the handling of the ship or its mooring lines.

30. The plaintiff has failed to prove by a preponderance of the evidence that the dock defendants were negligent with re-

spect to the condition of the Kenosha dock at the place where the M/V Kalidas was berthing on November 1, 1982.

31. The court finds that none of the named defendants are liable to the plaintiff for the death of Stanislaus Wojtyn.

## III. DISCUSSION

### A. *Accounts and Opinions of Witnesses*

■ Due to an unfortunate combination of circumstances including inclement weather, darkness, and a lack of eye witnesses, the plaintiff has been unable to marshall sufficient evidence to persuade the court that either the ship defendants or the dock defendants breached the duty of ordinary care they owed to Stanislaus Wojtyn during the berthing operation of the M/V Kalidas on November 1, 1982. None of the fact witnesses saw Wojtyn being knocked off the dock and into the water. The three other linesmen were facing ahead with Wojtyn at the rear of the line when the accident occurred. Foreman Delaney, security guard Erbentraut, and additional chief mate Narula were not watching Wojtyn at the time either. What these witnesses did observe prior to the drowning was hampered by the fog, rain, and lack of lighting in the immediate area. Based on their observations under these circumstances, the fact witnesses offered the following possible explanations for Wojtyn's death:

James Delaney: Delaney had no opinion as to how the accident happened. However, he testified that he did not observe either mooring line drag in the water. *See* Transcript at 21, 23, 91. He also stated that there was no lightening on the dock itself. *See Id.* at 46.

Ross Bauers: Bauers was of the opinion that the first line caught in the anchor, then snapped loose to strike Wojtyn, although he admitted that he did not actually see the line caught on the anchor. *See* Transcript at 151–56. Bauers, who testified that he was carrying the eye of the second line, stated that the second line did not dip into the water, did not break, and did not become snagged on the dock. *See Id.* at 122, 131, 135, 141. He did not feel any movement on the second line immediately prior to the accident. *See Id.* at 130, 134.

Phillip Hegforce: Hegforce, the second longshoreman in the line carrying the second hawser, believes that the second line hit Wojtyn. *See* Transcript at 299. He testified that the harbor was calm and that the second line dropped into the water, but was not caught on the dock face at the time of the accident. *See Id.* at 292, 313, 323. Like Bauers, he did not feel the line move before the accident. *See Id.* at 318. Hegforce observed that, after the accident, the second line, which he described as smoke-colored, was taken back up on the ship and that "what looked like a brand new one, a yellow one" was paid out to complete the mooring operation. *See Id.* at 294.

Glenn Miller: Miller was standing closest to Wojtyn at the time Wojtyn was knocked into the water, however, Miller's account is at odds with the accounts of most of the other witnesses. According to Miller, Wojtyn carried the eye of the second line and was trying to attach it to the bollard where the first line was attached when he was hit. *See Id.* at 338–39. Miller saw the line "vibrate" just before the accident. *See Id.* at 339, 361. After the accident he noted that neither line was broken. *See Id.* at 368. He says that the water was calm and that the second line was draped into the water and caught on the dock several times while it was being carried. *See* Transcript at 336, 356, 357, 370. However, he did not remember that the second line was caught on the dock face at the time of the accident. *See Id.* at 323.

Elmer Erbentraut: Erbentraut, who was standing about thirty feet away from the linesmen, saw the second line dragging in the water. *See* Transcript at 44, 51. He noted that the linesmen had to stop several times because the line had become snagged on the dock. *Id.* at 48. During the mooring, the ship was standing still and there was no lightening, thunder or wind, according to Erbentraut. *Id.* at 32, 67, 69.

Sarveen Narula: Narula noted in the ship's official log book that the second line "surged" and became slack immediately prior to the accident. *See* Plaintiff's Trial Exhibit 5; Deposition of Sarveen Narula at 94, 157. At first, Narula thought the second line had parted. *See* Deposition of Sarveen Narula at 94, 161. Narula testified that by "surged," he meant that the line became slack. *See Id.* at 98, 112, 191. Immediately following the death, he told the Coast Guard that the second line had been

**1428**

attached to the second cleat before the accident. *See Id.* at 101. Although he acknowledged that a line only parts when too much tension is applied, he stated that there was no tension on the second line and that it had not snagged on the dock. *See Id.* at 162–64. He said that the second line was intact when it was returned to the ship. *See Id.* at 194, 219–20. According to Narula's entry in the ship's log, the starboard anchor was dropped and subsequently raised during the berthing procedure and the swell in the harbor was negligible. *See* Plaintiff's Trial Exhibit 5; Deposition of Sarveen Narula at 20–21, 23, 64.

Noel D'Cruz: D'Cruz was the third mate aboard the M/V Kalidas on November 1, 1982. In his statement, taken on the day of the accident, he said that the second line encountered a "sudden jerk" prior to the accident. *See* Plaintiff's Trial Exhibit 9.

Except for Erbentraut and Bauers, who had left their employment at the dock by the time of trial, all the other witnesses were employed by one of the defendants at the time they testified. Narula, who claimed he could not remember most of the material events which occurred on the early morning of November 1, 1982, had rejoined the Kalidas as chief officer by the time his deposition was taken on December 6, 1983. Miller, the linesman whose version differed markedly from that of the other two linesmen, filed a lawsuit against the same defendants shortly after the trial.

In several instances the testimony offered at trial differed in material respects from statements given by the same witnesses immediately after the accident. For example, in his statement of July 29, 1983, Miller stated that he was not holding the line when Wojtyn was knocked into the water. *See* Defendants' Trial Exhibit 226. But at trial, Miller implied that he was still holding the line because he felt movement and saw a vibration seconds before the accident. *See* Transcript at 361–69. Narula, who could remember little relevant information by the time of his deposition a year after the accident, gave a statement on November 1, 1982, in which he said that: "Suddenly the second head rope surged and became very slack and I presumed that the line had parted and informed the bridge accordingly." *See* Plaintiff's Trial Exhibit

8. Later, Narula and the defendants' counsel took pains to explain that "surged" means "to go slack" in the parlance of maritime law. *See* Deposition of Sarveen Narula at 98, 112, 191; Defendants' Trial Exhibits 223, 224, 225. It strikes the court as unlikely that a person would recite words with the same meaning twice in the same sentence ("surged and became very slack"). In contrast, Charles L. Schoepke, a Kenosha police officer, who was called to the scene immediately after the accident and took statements from witnesses, reported that the captain told him that at the time of the drowning he had been informed that two lines were hooked to the bollards and that: "One of the lines became taut, and then it was loose." *See* Plaintiff's Trial Exhibit 41. These discrepancies, as well as the varying accounts of the biased fact witnesses at trial, undermined the credibility and weight the court was able to give to most of the testimony.

The experts were similarly divergent in their opinions. Dr. John Samson, who performed the autopsy on Wojtyn's body, believed that Wojtyn's injuries indicated that the linesman had been hit by two objects at approximately the same time. He believed that Wojtyn's massive injuries were caused by the second line, possibly because of a "snaking" movement. *See* Transcript at 207, 244–46, 260.

Earl L. Shaw, Jr., who was retained as an expert for the ship defendants but whose deposition testimony was offered by the plaintiff, had formed the opinion that the second line became caught on the dock, then snapped loose striking Wojtyn. *See* Deposition of Earl L. Shaw, Jr. at 46–52. Shaw formed this opinion after visiting the death scene on November 1, 1982, and inspecting the ship and dock and taking statements from witnesses. He concluded that the second line became caught on the dock, then snapped loose striking Wojtyn. *See* Deposition of Earl L. Shaw, Jr. at 46–52. However, he would not rule out the movement of the ship, or lightening, or the possibility that the line caught on the anchor as causes of the accident. *See Id.* at 41, 70, 89, 97, 109.

The expert retained by the plaintiff, J. Hal Brown (whose deposition testimony was offered by the dock defendants), was of the opinion that an extraordinarily fast takeup of the second line by the ship's crew caused the blow to Wojtyn. *See* Deposition of J. Hal Brown at 70–72 (August 23, 1984). Brown arrived at this conclusion solely on the basis of statements taken at the scene and from deposition testimony. He did not view the ship or the dock and did not personally interview any of the witnesses.

### B. *Res Ipsa Loquitur*

■ The plaintiff recognizes that there is no direct evidence of what, if any, negligent act or omission caused Wojtyn's death, but asks the court to employ the doctrine of *res ipsa loquitur.* Under this doctrine the finder of fact may, but is not required, to infer negligence from the unexplained happening of an event which in the ordinary course of things would not occur in the absence of negligence. Before making such an inference, the finder of fact must find by a preponderance of the evidence that:

1. the thing which caused the injury was in the exclusive control of the defendant;

2. the injury is such as in the ordinary course of things does not occur if the one having exclusive control uses proper care; and

3. that the injury was not due to any negligence on the part of the plaintiff.

*See Jesionowski v. Boston & Maine Railroad*, 329 U.S. 452, 456, 67 S.Ct. 401, 403, 91 L.Ed. 416 (1947). The United States Supreme Court has explained that:

... *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict.

*Sweeney v. Erving,* 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913).

The court has reservations as to whether this doctrine has any application in a trial to the court when involuntary dismissal has already been denied. In any case, the doctrine does not apply in this case, because the evidence fails to meet the second prong of the *Jesionowski* test. *See Savard v. Marine Contracting, Inc.,* 471 F.2d 536, 542–43 (2d Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2778, 37 L.Ed.2d 404 (1973) (all three prongs of test must be met).

The court has found that Wojtyn was struck by a mooring line. No findings at the autopsy indicated that he had been struck by lightning and no witness reports seeing a lightning strike in the immediate vicinity of the longshoremen at the time of the accident. It is also improbable that Wojtyn simply fell into the water because witnesses saw Miller knocked off his feet at the same time. *See, e.g.,* Transcript at 124.

The lines were in the exclusive control of the ship defendants during the berthing operation, even though the longshoremen were carrying one end of the second line. The Supreme Court has explained that the "exclusive control" requirement is not disproved by the plaintiff's participation in the operation, where the plaintiff was not negligent and his actions "had no causal connection with the accident." *See Jesionowski v. Boston & Maine Railroad,* 329 U.S. at 457–58, 67 S.Ct. at 404. There is no evidence that Wojtyn or any of the other longshoremen were negligent with respect to the movement of the line. The sheer weight and size of the ship's hawsers precludes the possibility that any or all of the longshoremen could have moved the line with a force sufficient to cause the massive injuries to Wojtyn.

■ As for the requirement that the negligence of the injured person not have contributed to the accident, the autopsy and some of the testimony indicates that Wojtyn was standing on the water side of the line before he entered the water. Standing on the water side of a mooring

line is an unsafe position which prudent longshoremen avoid. *See* Deposition of Earl L. Shaw, Jr. at 19–20. Dr. Samson conceded that, had Wojtyn been knocked onto the dock instead of into the water, he might have recovered from his injuries. *See* Transcript at 227. Thus, there was sufficient evidence that Wojtyn was contributorily negligent with regard to his death, but not with regard to causing the movement of the line which caused the initial injury.

■ Despite a showing of exclusive control and lack of contributory negligence, the second requirement for the application of *res ipsa loquitur* is not met because the record is replete with indications that the snapping of a mooring line can occur even though the party controlling the line uses proper care. The line could have become snagged on the dock, then snapped back, as Earl Shaw theorized, or the movement of the line could have been caused by the movement of the ship due to a swell. It is also possible that the line split or was caught on an anchor, but no witness actually observed anything which would support either possibility. It is also possible, as J. Hal Brown thought, that the crew was mistakenly informed that the second line had been attached to the second bollard and that there was a rapid takeup of the line. However, no witness or expert established that the ship's machinery was capable of such a rapid, forceful retrieval of the line. *See, e.g.,* Deposition of Earl L. Shaw, Jr. at 101–02.

The only conclusion the court can draw from this record is that the evidence presented does not tell the whole story. Due to the gaps and discrepancies, it would be sheer speculation to select one witness's version of events over another's. The mere happening of an accident does not give rise to an inference of negligence or breach of duty under general maritime law. *See Estate of Larkins v. Farrell Lines, Inc.,* 806 F.2d 510, 512 (4th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). Where varying explanations are equally probable, *res ipsa loquitur* cannot apply. *Id.* In this case far

too little is known of the facts leading to Wojtyn's death to "let the thing speak for itself." Therefore, the court is unable to find by a preponderance of the evidence that either the ship or dock defendants or a combination of the two were negligent or that their acts or omissions caused the death of Wojtyn. *See generally Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547 (5th Cir.1987) (evidence insufficient to fix liability for seaman's disappearance in Jones Act case); *Estate of Larkins v. Farrell Lines, Inc.,* 806 F.2d 510 (4th Cir.1986) (insufficient facts to find shipowner liable for sailor's disappearance in Jones Act case), *cert. denied,* — U.S. —, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); *McMillan v. Marine Sulphur Shipping Corporation,* 607 F.2d 1034 (2d Cir.1979) (plaintiff failed to meet her burden of proof with respect to shipowner's negligence in wrongful death action brought under Longshoremen's and Harbor Workers' Compensation Act), (5th Cir.1977), *cert. denied* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *Marvin v. Central Gulf Lines, Inc.,* 554 F.2d 1295 (5th Cir.1977) (seaman bringing suit under the Jones Act for injuries sustained when he was struck by a line failed to produce evidence that shipowner was negligent), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 762 (1978).

## IV. CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over the admiralty and maritime claims of the plaintiff pursuant to 28 U.S.C. § 1333 and the Admiralty Jurisdiction Extension Act of 1948, 46 U.S.C. § 740. *See Gutierrez v. Waterman Steamship Corporation,* 373 U.S. 206, 209–10, 83 S.Ct. 1185, 1187–88, 10 L.Ed.2d 297 (1963); *Gebhard v. S.S. Hawaiian Legislator,* 425 F.2d 1303, 1306–07 (9th Cir.1970); *Maryland Port Administration v. SS American Legend,* 453 F.Supp. 584, 587–90 (D.Md.1978); *Adams v. Harris County, Texas,* 316 F.Supp. 938, 940–44 (S.D.Tex.1970), *cert. denied,* 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972).

2. The court has ancillary jurisdiction over the nonadmiralty and nonmaritime

claims and cross-claims in this action which were properly brought pursuant to Federal Rules of Civil Procedure 13(g) and 14(c). *See In re Oil Spill by Amoco Cadiz Off the Coast of France on March 16, 1978,* 699 F.2d 909, 912–15 (7th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 172 (1983); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 809–11 (2d Cir.1971).

3. This court has *in personem* jurisdiction over the individual defendants by service of process. The court has *in rem* jurisdiction over the M/V Kalidas by virtue of the understanding reached and memorialized in the Letter to Karl Cambronne, Esquire, from The Steamship Mutual Underwriting Association Limited. *See* Plaintiff's Trial Exhibit 7.

4. Venue is proper in the Eastern District of Wisconsin. *See* Federal Rule of Civil Procedure 82; 28 U.S.C. § 1391.

■ 5. The substantive law to be applied in an admiralty action is federal maritime law. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628–29, 79 S.Ct. 406, 408–09, 3 L.Ed.2d 550 (1959); *Complaint of Valley Towing Service,* 629 F.Supp. 139, 144 (E.D.Mo.1985).

■ 6. The United States Supreme Court has created a federal maritime remedy for wrongful death which displaces state law remedies. *See generally Moragne v. United States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

■ 7. In an admiralty case the burden of proof is upon the plaintiff to show fault or negligence on the part of the defendants and to show that such negligence was the proximate cause of the injury. That burden of proof must be carried by a preponderance of the evidence, whether direct or circumstantial. *See Valentine v. United States,* 630 F.Supp. 1126, 1132 (S.D.Fla. 1986); *Witco Chemical Corporation v. M/V Miss Carolyn,* 426 F.Supp. 373, 375 (W.D.La.1977); *King v. Testerman,* 214 F.Supp. 335, 338 (E.D.Tenn.1963).

8. "Negligence is ... a failure to observe for the protection of the rights of others that degree of care, precaution, and vigilence which the circumstances justly demand ... in other words ... negligence is the failure to observe ordinary care, and ordinary care is that degree of care which people of ordinary prudence and sagacity use under the same or similar circumstances." *Gallick v. Baltimore & Ohio Railroad Company,* 372 U.S. 108, 118 n. 6, 83 S.Ct. 659, 665 n. 6, 9 L.Ed.2d 618 (1963).

■ 9. When a claim is brought under maritime jurisdiction, the sufficiency of the evidence is governed by federal law. *See Harrelson v. United States,* 420 F.Supp. 788, 794 (S.D.Ga.1976), *aff'd,* 548 F.2d 353 (5th Cir.1977).

■ 10. A finding of negligence may not be based on surmise, speculation or conjecture. When the circumstantial evidence is as consistent with the theory that the defendant was not negligent as it is with the theory that he was, a fact finder is not allowed to guess. *See Jastremski v. United States,* 737 F.2d 666, 671 (7th Cir. 1984); *Valentine v. United States,* 630 F.Supp. 1126, 1132 (S.D.Fla.1986); *Harrelson v. United States,* 420 F.Supp. 788, 794 (S.D.Ga.1976), *aff'd,* 548 F.2d 353 (5th Cir. 1977).

11. Based on the testimony and evidence adduced at trial, the court concludes as a matter of law that the plaintiff has not met its burden of proving that the M/V Kalidas, or Shipping Corporation of India, Ltd., or KAT Realty Corporation, or Northbrook Property and Casualty Insurance Company negligently acted or failed to act with respect to any of the events leading to the death of Stanislaus Wojtyn.

12. The M/V Kalidas and Shipping Corporation of India, Ltd. are not liable to the plaintiff for the death of Stanislaus Wojtyn.

13. KAT Realty Corporation and Northbrook Property and Casualty Insurance Company are not liable to the plaintiff for the death of Stanislaus Wojtyn.

## ORDER

Based on the findings of fact and conclusions of law set forth above, the court

ORDERS that judgment shall be entered in favor of the M/V Kalidas, Shipping Corporation of India, Ltd., KAT Realty Corporation and Northbrook Property and Casualty Insurance Company and against the plaintiff 1st Bank Southeast of Kenosha, Wisconsin on all the plaintiff's claims against these defendants.

IT IS FURTHER ORDERED that the third and fourth party complaints and all cross claims ARE DISMISSED because they are moot.

IT IS FURTHER ORDERED that this action IS DISMISSED on its merits with each party to bear its own costs.